**Pages 1 - 29**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

CINEMATIX, LLC, a Washington )
limited liability company; et )
al., )
  )
       Plaintiffs, )
  )
  VS. )  **No. C 19-2749 EMC**
  )
EINTHUSAN, a Canadian company; )
et al., )
  )
       Defendants. )
_____)   San Francisco, California
          Wednesday, January 8, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs Cinematix, LLC, AP International,  Home Screen
Entertainment, FZE, Home Screen  Entertainment, PTE. Ltd.:
             LEE & HAYES, P.C.
             601 W. Riverside Avenue, Suite 1400
             Spokane, Washington 99201
      **BY: GEORGE H. BRUNT, ESQ.**

For Defendants Lotus Five Star, Ltd., Arun Shanmuganathan, and
Leo India Films, Ltd.:
             MUNSCH HARDT KOPF & HARR, P.C.
             500 N. Akard Street, Suite 3800
             Dallas, Texas 75201-6659
      **BY: STEVEN N. WILLIAMS, ESQ.**

             HUDNELL LAW GROUP P.C.
             800 W. El Camino Real, Suite 180
             Mountain View, California 94040
      **BY: LEWIS E. HUDNELL, III, ESQ.**

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
           Official Reporter - U.S. District Court

**Wednesday - January 8, 2020**                              **1:31 p.m.**

                        **P R O C E E D I N G S**

                              **---000---**

THE CLERK:  Calling civil action 19-2749, Cinematix LLC versus Einthusan, et al.

   Counsel, please approach the podium and state your appearances for the record.

MR. BRUNT:  May it please the Court, George Brunt representing plaintiffs Cinematix, AP International, and Home Screen Entertainment.

THE COURT:  All right.  Thank you, Mr. Blunt.

MR. WILLIAMS:  Good morning, Your Honor.  Steve Williams, from Munsch Hardt, representing the defendants Arun Shanmuganathan, Lotus Five Star, and Leo India Films.  Also with me is my local counsel Lewis Hudnell.

THE COURT:  Welcome.

MR. HUDNELL:  Good afternoon.

THE COURT:  Good afternoon.

   Let me just briefly address the question of service here. The challenge to service is brought, at this point, solely by Mr. Shanmuganathan.  Is that how you say --

MR. WILLIAMS:  Yeah, Shanmuganathan.  Or if it's easier to refer to him by his first name, Arun, that is perfectly fine.

THE COURT:  All right.  Maybe I'll do that.

As I recall, he is the only defendant that is contesting service; correct?

**MR. WILLIAMS:**  Primarily.  Lotus raised an issue about service, but, really, the real issue is with Mr. Shanmuganathan.

**THE COURT:**  And so it is -- I mean, part of that turns on where he resides.  There's some conflicting evidence here about whether he's Canadian or in Sri Lanka.

**MR. WILLIAMS:**  That is correct.  He is a Sri Lanka citizen, and he resides in Sri Lanka.  From time to time, over the years, he has -- he has been in Canada, but his residence, and certainly since this lawsuit was filed, his residence has been and is now in Sri Lanka.

**THE COURT:**  All right.  Let me ask the plaintiff whether there's any contrary evidence to his actual residence for purposes of service.

**MR. BRUNT:**  No, Your Honor.  We don't have any evidence that conflicts with the evidence provided by defendants.

**THE COURT:**  All right.  So then the question is whether alternative service -- is that under Section 10, whatever, Article 10 --

**MR. WILLIAMS:**  Yes.

**THE COURT:**  -- of the Hague Convention, whether Sri Lanka -- apparently, unlike Canada, which does recognize

and permits alternative forms of process, has Sri Lanka precluded.

And there's a statement that it has, but I don't know -- I don't know if there's any law on that.

You say Sri Lanka has objected to all alternative methods of service.  Is there documentation, or is that disputed by plaintiffs?

**MR. BRUNT:**  We're not aware of any objection by Sri Lanka to alternative service.

**THE COURT:**  Do you know of any contrary -- I mean, how do we resolve this question without looking at actual law?

**MR. BRUNT:**  Proving a negative.

**MR. WILLIAMS:**  First of all, Your Honor, I apologize, because our brief should have cited the legal authority for that statement.  And I will be happy to supplement the Court with authority.

When Sri Lanka adopted the Hague Convention, there is -- there's a mechanism for countries to opt out of certain provisions of the Hague Convention, Hague Convention protocols.

Sri Lanka opted out of electronic service.  I can't cite to you, off the top of my head, the statutory citation for that, but I will be happy -- and, again, I apologize.  That should have been included in a brief, and that was an oversight on my part that it was not, but if the Court wishes and will permit, I will be happy to supply the Court with that legal

authority following the hearing.

THE COURT:  All right.  Let me ask you this.  It may become moot depending on what we do here.  Mr. Shanmuganathan has indicated he would accept service in Canada; correct?

MR. WILLIAMS:  He has agreed that he would be amenable to service in Canada, yes.

THE COURT:  Okay.  So that does raise -- just to cut to the chase here, I mean, there are interesting questions about personal jurisdiction and whether we find that there was express aiming or not under the circumstances here.

But in view of the fact that almost every entity involved here is either Canadian or of some nonCalifornia base, that, you know, it would seem that most of the evidence, certainly a lot of the witnesses would be not from California.  And I'm not sure what California's interest is as a sovereign in this matter.

Why shouldn't this case be dismissed under *forum non conveniens* in favor of Canada?  You won't have the service issues.  You won't have a close question of personal jurisdiction, which you do here.  There's no indication that Canadian courts would not be able to render an analysis of copyright principles.  So what's -- why not?

MR. BRUNT:  Well, Your Honor, primarily because the website, itself, is hosted on U.S. servers.  The films are hosted in the United States.  The defendants have contracts,

through their terms of use, with California residents based here in the district.

**THE COURT:**  So maybe the means of carrying out the instrumentalities may be located here, but the direction is coming from the defendants; right?  I mean, the aiming, if there is, for instance, any express aiming it's being directed from, obviously, actors.

**MR. BRUNT:**  It's not really clear, from anything that defendants provided, exactly how many people are in Canada versus Sri Lanka or elsewhere in the world.

They've said that some of the people, some of the witnesses are in Canada, but they haven't specified how many versus how many are in Sri Lanka.

If we're going to travel from Sri Lanka to another, you know, North America country, I don't see that Canada is more convenient than California.

And the only evidence that may be located in Canada would be the alleged licensing agreements where defendants have claimed that they have licenses to the films in question.

**THE COURT:**  Well, both Lotus and Leo are located in Ontario; right?

**MR. WILLIAMS:**  That is correct, Your Honor.

**THE COURT:**  They don't have offices here in California?

**MR. BRUNT:**  Not that we know of.

**THE COURT:** And to the extent Mr. Shanmuganathan has some residence or base in Canada, as opposed to Sri Lanka, that's also in Ontario, according to the complaint, paragraph 20, says he's a resident of Markham, Ontario.

**MR. BRUNT:** Again, it's not clear.

**THE COURT:** So what's an -- I understand the instrumentalities, but I'm not sure how material, you know, the website -- are there documentation from the website?  These are more digital kind of documents that would have to be obtained from third parties; is that the idea?

**MR. BRUNT:** Yeah, Amazon hosting and GoDaddy.  Some of those -- some of the evidence has to do with the personal jurisdiction, as well, where they've submitted to the personnel jurisdiction of this court through their DMCA counter notification.

**THE COURT:** I understand there may be jurisdiction here.  There's an argument.  Couple of arguments.  There's consent, there's implied -- you know, if you get to the core issues about sufficient minimum contacts, there are disputed issues.

It seems to me that there are some issues there that have to be resolved, and they're not -- it's not one of those easily slam dunk ones.  It does require some detailed analysis, which the Court is willing to do.

But given the ambiguity about the potential of a gray area

with jurisdiction and the fact that it seems like, you know, all the parties -- none of the parties really reside here, that the only thing that can be said that connects this state or this district with the case is that, I guess, the servers are located in the Northern District; correct?

MR. BRUNT:   (Nods head.)

THE COURT:   And a lot of the customers who download are located in California.  But it's not an exclusively California phenomenon.  I assume whoever watches this is from all over the country; in fact, all over the world.

MR. WILLIAMS:   If I may address that point, Your Honor?

THE COURT:   Yeah.

MR. WILLIAMS:   So, first of all, Leo Indie Films does not have any servers located in California let alone in the Northern District of California.  Their computer servers are located in Toronto, Dallas, Texas, Washington, D.C., and London, England.

When the plaintiffs, in their briefing, have tried to point to things to draw connections to California, largely what they have argued is, well, there's activity in the United States.

Activity in the United States does not conflate to activity within the Northern District of California sufficient to justify the Court entertaining this case.

Now, it is -- we would acknowledge, we will acknowledge that there are subscribers, there are individuals who subscribe to the einthusan.tv or einthusan.com website who are located in California.  However, there are subscribers throughout the United States, throughout the world.  And there's been no evidence presented by the plaintiff as to how many subscribers are in California versus other parts of the country, number one.

Number two, even though there are subscribers, there's been no evidence presented by the plaintiffs that there have actually been acts of copyright infringement; i.e. viewers viewing alleged material inside the state of California much less in the Northern District of California.

At most, there are posts where people have gone on Facebook or other social media and have made comments about seeing, you know, different movies.  But they don't say, well, I watched this while I was in San Francisco versus I watched this while I was with my family on the ski slopes in Colorado.

So there's really no evidence to tie the claims in this case to California much less to the Northern District of California.

And just to summarize, we've provided a slide deck.  And I'm happy to go through the slides, but one of the slides that I would direct the Court's attention to, when you go back after the hearing, if you wish, we've got a chart where we list the

various factors that are relevant to a *forum non conveniens* inquiry.  And every one of the factors weighs in favor of Canada.  The only factor that weighs -- the only factor that applies to California, as well, is that both courts are familiar with the subject matter of copyright -- copyright law.

So we would simply say that, in response to your comment, there are no servers located in California.  The servers are all located outside of California.

Yes, there are subscribers in California, but there are subscribers located throughout the country.  And there's no actual evidence of specific viewing of copyrighted -- allegedly copyright materials in California.

THE COURT:  So servers, maybe you can describe to me mechanically how it works.  If someone wants to access a movie or some content material from -- I guess it would be -- I mean, how would it work?

MR. WILLIAMS:  Okay.  I'll try to explain.  And understand, Judge, Your Honor, that although I have represented these clients for a number of years, I am not a technical person.

THE COURT:  I understand.

MR. WILLIAMS:  But the way it works is the Einthusan websites, which are einthusan.tv, einthusan.ca, einthusan.com, those are websites owned by the defendant Leo India Films.

THE COURT:  Yes.

**MR. WILLIAMS:** They are registered through Internet domain registrars. Go GoDaddy. There are some other domain registrars. And I apologize, the name of the company is escaping me right at the moment that has the einthusan.ca website.

**THE COURT:** Right.

**MR. WILLIAMS:** So the registrar registers the domain name with -- with its default ICANN. And then through that registration then a person in their home can go -- open up a Web browser, type in the address einthusan.tv, let's say, and it will direct that person to the website.

The website, the material that is contained on the website is housed on computer servers. And those computer servers, in the case of Leo India Films, are located in several locations; Toronto, Dallas, Washington, D.C. and London, England.

And it's somewhat random. It's a matter of size and capacity. The computer servers have -- have so much hard drive space and can house, you know, so much data. Leo Indie Films has a library of over 7,000 films. So there's a considerable amount of data.

So once you -- once a customer has accessed the website and said, I want to view movie X, then there's an algorithm. And that algorithm will say, okay, movie X is located on the hard drive on the server in Toronto.

**THE COURT:** So there are multiple servers in multiple

countries is what you're saying?

**MR. WILLIAMS:**  Yes.  And so it will load it up.  Or if this movie you want to see is located on the Dallas server, and so it sends a message to the Dallas server and the Dallas server pulls up the movie.

So that is a very, very nontechnical, very high-level description of how it works.

**THE COURT:**  Right.  Some servers are in --

**MR. WILLIAMS:**  Yes.

**THE COURT:**  -- Canada?

**MR. WILLIAMS:**  Yes.

**THE COURT:**  Some are in Dallas?

**MR. WILLIAMS:**  Correct.

**THE COURT:**  And there are or aren't servers in California?

**MR. WILLIAMS:**  There are no servers in California.

The servers are located in Toronto, Dallas, Texas, Washington, D.C., and London, England.

**THE COURT:**  Do you have a different understanding mechanically of how movies are --

**MR. BRUNT:**  That seems to be an adequate description.  The only thing I would say is I think the location of the servers is less important to this analysis than the location of where the streaming is happening and where the movies are being streamed to consumers.

**THE COURT:** For jurisdictional purposes?

**MR. BRUNT:** Yes.

**THE COURT:** What I'm interested in is getting to the merits of the case. If the case were adjudicated on summary judgment or for trial --

**MR. BRUNT:** Sure.

**THE COURT:** -- who's going to be called? That's one of the things you look to in *forum non conveniens*. Where are the witnesses for trial? What's the evidence for trial?

I'm not sure -- do the servers themselves play much of a role other than -- there won't be much dispute about the content. I assume the dispute is going to be what was licensed, what was not. Won't be too much dispute to show what was downloaded.

Is there anything in California, is there a piece of hard evidence, digital evidence or witnesses that will be called, if this case is tried, that resides in California? Or who resides in California?

**MR. BRUNT:** The only thing I can think of, Your Honor, is we may seek out testimony from consumers about, you know, being misled by statements on the Einthusan website saying that it's fully legal and licensed, where we have evidence that it's not.

**THE COURT:** But that could be established by a Canadian downloader, right, a subscriber?

**MR. BRUNT:**  It could be any subscriber.

**THE COURT:**  The same misrepresentation goes out to everyone.

**MR. BRUNT:**  Yes.

**THE COURT:**  This is a license.

**MR. BRUNT:**  Yes.

**THE COURT:**  And that's the problem I have is, like, well, okay, there's no -- the players are kind of all over the world.  Many of them in Canada.

The witnesses could be from anywhere.  Doesn't sound like there's going to be very many key witnesses.  I'm not sure if there's any required witnesses from California.

The servers, I'm not even sure the location of the servers, on the merits, has much to do with this case, but if they did they're not here.

Sometimes you look for the sovereign interest, whether the State has an interest.  And if this were a consumer fraud case where the State has kind of a *parens patriae* interest in protecting consumers against misrepresentations or fraud, you could see that.

But here the dispute is really between two alleged owners of intellectual property that don't reside here.  So I'm having trouble identifying a sovereign state interest, you know, in this matter of coming from the state.

And then you have the service issues, and then you have

the personal jurisdiction questions.  And I understand there's arguments on both sides of that, but it's a lot more straight forward in Canada, it seems to me.

So it seems like all the indicators, both in terms of practical trial of the case, access to the evidence, access to witnesses, where there's clear jurisdiction, would all point to Canada.

**MR. BRUNT:**  Your Honor, if I could address some of the points that --

**THE COURT:**  Yeah.

**MR. BRUNT:**  -- opposing counsel made.

They concede that there are subscribers here in this district.

**THE COURT:**  Yeah.

**MR. BRUNT:**  We're not going to be able to know the numbers, you know, the absolute numbers without the discovery to figure out how many subscribers are here versus elsewhere, but they do concede that there are subscribers here.

**THE COURT:**  Can that discovery about the numbers and distribution of subscribers -- that doesn't have to be California-based discovery.  I assume it's going to be based on their records.

**MR. BRUNT:**  Yes.

**THE COURT:**  If there's a copyright violation you're going to want to know whether the subscriber is in Dallas or

New York or Germany or here; right?  Maybe not Germany, but, I mean -- in any event, I'm not sure why that's a California --

MR. BRUNT:  We will want to uncover the extent of the infringement globally.

But in terms of California having a public interest in protecting its citizens from unwittingly streaming unlicensed infringing copies of copyrighted works, I feel there is a consumer protection aspect to the case that California should have an interest in.

THE COURT:  So there has been unwitting infringement?

MR. BRUNT:  Correct.

There's an implication made that viewers that are based in California may have traveled and streamed on a mobile device out of state, but I don't think that carries much weight.

Right now our evidence for the fact that many of these consumers that are streaming movies are based in this district are their location tags on the comments that they're making, which does indicate that there are a significant number of consumers streaming the content from this district.

The other point I wanted to raise is about the availability of an adequate remedy in Canada.

Now, Canada does offer injunctive relief, but the primary thing that we want to do with our injunction is go to the web posts and go to, you know, GoDaddy and the streaming providers and ensure that those movies are not streamed anymore without a

valid license.  And having a judgment in hand is really important to that.

And I know from other enforcement efforts on behalf of other clients that it's very difficult to enforce that in the United States with a foreign judgment.  Amazon and other providers will want to see a U.S. judgment.

**THE COURT:**  Can't that judgment be domesticated?

If you have a Canadian judgment finding infringement and injunction, and all that, I assume some form of, like, declaratory relief, if you're saying that U.S. companies won't respect that, how hard is it to domesticate that?

**MR. BRUNT:**  I'd have to look into the procedures, but that is a good point, Your Honor.

**THE COURT:**  What's your response to that?

**MR. WILLIAMS:**  So this raises an excellent point.  And I'm glad that Your Honor has asked about this.

So, first of all, yes, a foreign injunction, an injunction, for example, issued by a court in Canada, can be domesticated in the United States.  How it gets domesticated, I believe, varies a little bit depending on the state in which it is being domesticated, but it certainly can be domesticated.

But here's the real nub of the issue.  The injunction -- any injunction presumably would be an injunction that says, "Leo India Films, you are enjoined from doing the following things."

An injunction of that nature, coming from a court in Canada, is far more powerful and far easier to enforce against the enjoined party, Leo India Films.

They're located in Canada.  If a Canadian court of competent jurisdiction were to issue an injunction, that injunction can be enforced, that court can haul Leo India Films before it on a contempt charge, if Leo India violates that injunction, much easier than enforcing that injunction against Leo India films in California or any other court in the United States.

What's telling is --

**THE COURT:**  Well, if this court had jurisdiction over Leo why -- and Leo violated the terms of an injunction, why couldn't Leo be easily held in contempt by this court?

**MR. WILLIAMS:**  If Leo is subject to jurisdiction, yes, Leo -- Leo can be held in contempt.  The mechanism -- by this court.  The mechanisms for attaching -- number one, the mechanisms for attaching assets, the mechanisms for taking curative action to actually, you know, carry out that enforcement are more easily performed --

**THE COURT:**  Enforcement of that is a little harder because it's a foreign entity.

**MR. WILLIAMS:**  Yes, yes.

And what's interesting here is what the plaintiff is saying, is the plaintiff is not really expressing concern over

whether it can enforce its injunction begins Leo.

What the plaintiff wants to do is it wants to take this judgment and go to Amazon or GoDaddy and/or other third parties who are not present in this case, not parties in this case, and say to those entities, hey, here's a piece of paper, here's a judgment that was issued.  And you, Amazon, or you, GoDaddy, you need to take certain steps, you need to take certain actions so that you don't run afoul of this order that doesn't even apply to you.

That is a common enforcement tactic that's used in cases where the defendant simply defaults and never appears in the court.

That's not what we have here.  Where a defendant actively defends himself, this is a dispute between the plaintiff and Leo India Films.

The plaintiffs' interest in enforcing the judgment should be with respect to Leo not with respect to taking a piece of paper and going to other third parties who aren't even before the Court, aren't even present in this case.

So this, again, weighs in favor of having this case adjudicated in Canada, before a Canadian court, where the defendants are located.

**THE COURT:**  All right.

**MR. WILLIAMS:**  We would also just point out, we cited -- I know in one or two of our briefs -- I apologize for

the number of trees that we've killed so far in this case, but I would direct your attention to the *Doe versus Geller* case. And this is cited in our slide deck.  It's on the last page of our slide deck.

In *Doe versus Geller* the Northern District of California gave a very nice statement -- and I will summarize it -- saying, basically, look, just because cases can be brought in the Northern District of California, because YouTube or Amazon or other tech companies are located here, that doesn't mean that they should be brought in the Northern District of California.

The Northern District of California is not intended to be the global adjudicator of all copyright disputes.  The case before the Court today is a perfect example of the type of case that is described by the Court in *Doe versus Geller*, where the Court did dismiss the case.

The issue there specifically was on jurisdiction as opposed to *forum non conveniens*, but the same principles apply here.  This case, the case before the Court today, fits squarely within *Doe versus Geller*.

**THE COURT:**  All right.  Is there any -- let me ask if there's anything about Canadian law, copyright law, that is deficient, in your view, compared to American copyright law?

**MR. BRUNT:**  There are no significant differences between Canadian copyright and U.S. copyright laws.  They are

both members of the WIPO treaty.  It's similar.

But may I address some of the points?

**THE COURT:**  Yeah.  I guess the main question that the parties seem to be disputing is sort of enforceability of a judgment, your ability to take a Canadian judgment and really seek relief against, sort of, relief defendants, third parties who may have some role in the flow of commerce here.

**MR. BRUNT:**  I think that's one of the major issues here in the prong of availability of an alternative forum.

Your Honor, when we looked at the infringing activity that was occurring here and had to make some decisions about where to bring the case, that decision was primarily made on the defendant's submission to personal jurisdiction in the Northern District of California.

We looked at bringing in Washington, where I live, or in Seattle, where one of the main defendants live.  We looked at bringing it in Canada.

But based on what we believed were some shell games with the corporate entities and that was kind of borne out by the evasive maneuvers to avoid personal service and the fake addresses that were not even actual places where we attempted to serve process, all of that supports our belief that it was going to be difficult to pin the defendants down and get them to show up in court in Canada.  Knowing that they had submitted to personal jurisdiction in this district through a direct

express statement, we felt this was the best forum.

There are two prongs for forum non conveniens.  It's a -- it's an extraordinary type of decision.  It's not one that is just done regularly or lightly.

You know, we've been discussing the availability of an alternative forum, but the other one is the public and private factors have to strongly favor dismissal of the case.

It seems, Your Honor, that we're kind of waving both hands back and forth.  And the burden has not been met to show that the public and private factors strongly favor --

**THE COURT:**  Which of the public/private factors actually favor California?  I'm looking at them, and none jump out at me as -- maybe enforceability of the judgment as to third parties is the only one that I've heard raised so far.

But the residence of the parties, the witnesses, access to the evidence, and source of proof, cost to bring witnesses to trial, and all that, and none of that seems to favor California.

**MR. BRUNT:**  Just one moment, Your Honor.

So the -- start with the public factors.  And, again, for me, I believe the strong public factor is the interests that the State of California has in protecting its citizens from unwitting copyright infringement and from being deceived by a company that says that all of its movies are legally validly licensed.

**THE COURT:**  But in that case, if you have an adequate forum to adjudicate those issues, a ruling by the Canadian court will just as effectively protect California residents because there won't be any more unlicensing.  Streaming will be stopped.  So they won't be unwitting participants in that if relief is obtained in the Canadian court.

**MR. BRUNT:**  I think that goes to the other factor, availability of another forum.  I think if it's a 50/50, it shouldn't be -- the Court should not find that the public and private factors strongly favor dismissal.

**THE COURT:**  I'm not sure it's 50/50.  I don't see the 50 on your side of the equation.

One thing I will say is this:  If I were to dismiss on *forum non conveniens* ground, that would be on the assumption, perhaps on the condition that service is effectuated and accepted in Canada.

Because if there's going to be a contest, part of the decision here is that seems to me there's clear jurisdiction in Canada, there's an indication by the individual defendant that he would be amenable and would accept service in Canada.

Now, if he were to go back on that and there was going to be a full contest of service, and all that, then Canada might not end up being the inadequate remedy.

So one thing I could do and might do is to hold this in abeyance and direct that you pursue your remedies in Canada and

obtain cooperation in terms of affecting service.

We know that the merits will go forward in Canada. And in that case it will be very clear at that time that you've got an adequate forum.

**MR. BRUNT:** Your Honor, the one thing that I still feel like the defendants have not met in terms of burden is, we know -- we understand that the companies are registered in Canada. But I don't know of any evidence that there is an office in Canada, that there are employees that reside in Canada, or to the extent that there are, how many there are. We have been told there are five employees. And we know that two of them, at least, are in Sri Lanka.

So, yes, there is a paper registration sitting with the Canadian equivalent of a secretary of state, but that doesn't -- that feels like a very thin amount of evidence to establish that Canada is a better jurisdiction to hear this case.

**THE COURT:** Well, those facts don't make California any better. Now you're not even a nominal presence in California. Even if the actual live bodies are in Sri Lanka or somewhere else, it doesn't help to be in California in that regards. You've got a problem no matter what if you're trying to obtain --

**MR. BRUNT:** Well, as between the U.S. and Canada, the vast majority of the viewership is in the U.S.

**THE COURT:**  Well, that's different than where the employees are and who might have access to documents and information.

The fact that there are viewers here, that may go to your damages.  But, again, the access to the evidence of how many viewers there are and where they are located and how much the damages -- first of all, that seems like that would at least be a nationwide number you would want.  And that evidence doesn't reside in California.  It may concern people who are customers in California, are streaming and, therefore, contributing to the infringement, were constituting the infringement analysis.  But I don't see how that's, quote, evidence within the meaning of the *forum non conveniens*.

So let me ask you, is there -- is there going to be a problem accepting service in Canada?

**MR. WILLIAMS:**  I see no problem accepting service in Canada.  And, in fact, this goes to a point that I really feel very strongly that I need to address, because Counsel -- plaintiffs raised this notion in their papers and have stated again today in court that the defendant evaded service and were trying to, in effect, duck service.

That is not the case.  What -- what happened in this case, first of all, the plaintiffs apparently went to an Internet cite called Whoz It, which is a -- sort of a phone book kind of directory where you can go and say, okay, if I look up such and

such website, URL address, who is that registered to and who's it associated with?

And so that pulls up the information that was available when -- when, for example, Lotus first registered einthusan.com with Go Daddy.  Boom, the information that was effective as of that date got loaded into Whoz It.

Now, then, if Lotus or then Leo moves to a different office, which companies do all the time, that information does not automatically get transmitted to Whoz It.

So when the plaintiffs started out saying, oh, we can't find these guys, these guys are using fake addresses and things, most of the information that they were looking at was from Whoz It, which is not information we compiled to begin with.

And, in fact, had the plaintiffs done a very simple Westlaw or Lexis search for the word "Einthusan," they would have uncovered a case out of the Northern District of Texas, *Konnect Corp. vs. Paperboard Innovations*, which was a 2012 copyright case involving the einthusan.com website.  And they would have seen that the lead counsel for Paperboard, at the time the owner of Einthusan, was myself.

A simple phone call to me would have revealed that, number one, I still represent these defendants; and, number two, we likely, in that circumstance, if requested to, to have accepted a waiver of service under Rule 4, we would have taken that

under consideration.

Those steps were never taken.  So I do take offense, actually, at the notion that my clients have done anything improper in trying to evade or avoid service.

And directly to your question, yes, if this case is in Canada, the defendants will accept service and appear in Canada.

**THE COURT:**  All right.  So this is what I'm going to do.  I'm going to indicate the Court's inclination to dismiss on *forum non conveniens* grounds for the reasons we stated.

I'll have a brief order summarizing rationale.  But there is an adequate forum, it appears to me, particularly if we do what I'm going to do.  And that is, I'm going to withhold the entry of that until you've had a chance to make your filing in Canada and see if you can work out service.

Maybe you can get counsel to accept service.  I don't know what the Canadian laws are, if they have an equivalent of Rule 4.  But whatever it is, if you can work out service and that case sort of gets vested in Canada, then I will complete the dismissal here so we are not doing it on two tracks.

Assuming that service is affected and the Canadian courts take jurisdiction over the case, it is an adequate forum.  There is no difference in substantive law.  I don't really see much difference in the -- the remedial powers of the Court there.

There perhaps might be an issue about getting relief as to third parties, and I don't know whether that's appropriate or not. But, if so, it seems to me that there are ways of domesticating foreign judgments such that you could get, under the appropriate conditions, an order from a U.S. court, if you needed to, and under the appropriate circumstances to enforce against a domestic third-party relief defendant if that's necessary.

For the reasons we've stated, the balance of public and private interest factors, I think, weighs heavily in favor of Canada here, given the residence and locations of the parties, the witnesses, the evidence. And there's no practical impediment to a case, that I could see, going forward in Canada.

I don't see a strong California sovereign interest that can't be adequately protected by the judicial proceedings in Canada and, you know, the parties be a California or even U.S. based parties, except for one plaintiff, and that's a Washington State entity.

So I'm going to essentially issue a conditional order of dismissal, but I'm going to hold that pending securing the forum in Canada, including service, which I hope you can work out.

**MR. WILLIAMS:** I'm confident we can, Your Honor.

**THE COURT:** Good. All right. So I will get out a

very brief order memorializing this, but that's where we stand.

**MR. WILLIAMS:**  Thank you, Your Honor.

**THE COURT:**  Good luck.  Thank you.

(At 2:12 p.m. the proceedings were adjourned.)

- - - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, February 14, 2020

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter